IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| CLOVERLEAF ENTERPRISES, INC., | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No.: RDB 10-407 |
| MARYLAND THOROUGHBRED, | * | |
| HORSEMEN'S ASSOCIATION, INC., *et al.*, | * | |
| Defendants. | | |

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

## <u>MEMORANDUM OPINION</u>

Plaintiff and Debtor Cloverleaf Enterprises, Inc. ("Cloverleaf"), which owns Rosecroft Raceway ("Rosecroft"),[1] a Maryland standardbred racetrack, brings this suit asserting antitrust and breach of contract claims against eighteen defendants - primarily racetracks, horsemen's associations and individuals that work for them. The thrust of Cloverleaf's action is brought against Defendants Maryland Jockey Club of Baltimore City, Inc. ("MJC"), Laurel Racing Association, LP ("LRA"), Thomas Chuckas, Jr. and Dennis Smoter (collectively, "Jockey Defendants"), and the Maryland Thoroughbred Horsemen's Association ("Horsemen"), Richard J. Hoffberger and Alan Foreman (collectively, "Horsemen Defendants"). Cloverleaf alleges that

---

[1] On June 3, 2009, Cloverleaf filed for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for this District. Cloverleaf continued in possession of its property and is operating its business as a debtor in possession, pursuant to the Bankruptcy Code, 11 U.S.C. §§ 1107 & 1108. Thereafter, Cloverleaf brought this action as an adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7015. By Order of February 22, 2010, this Court granted the Motion to Withdraw the Reference of Adversary Proceeding to the Bankruptcy Court, pursuant to 28 U.S.C. § 157(d), in light of the claims under the Sherman Act, 15 U.S.C. §§ 1 and 2, as well as claims relating to organizations and activities affecting interstate commerce.

the Defendants violated the Sherman Antitrust Act, 15 U.S.C. §§ 1 & 2 ("Sherman Act"), by engaging in a group boycott orchestrated to destroy competition in off-track betting and to monopolize the off-track betting market and in doing so engaged in a breach of contract. The Horsemen Defendants and the Jockey Defendants have separately moved to dismiss Cloverleaf's antitrust claims under federal law, and unfair competition and tortious interference with contract claims under Maryland law. Defendants Horsemen and the Maryland Horse Breeders Association, Inc. ("Horse Breeders") also move to dismiss Cloverleaf's breach of contract claim. The parties have fully briefed the issues and oral argument was presented to this Court on July 29, 2010. For the reasons that follow, the Jockey Defendants' Partial Motion to Dismiss (Paper No. 109) is DENIED, with those defendants being granted an extension of time to respond to Counts IV (breach of contract) and IX (right of setoff). The Horsemen Defendants and the Horse Breeders' Motion to Dismiss (Paper No. 110) is GRANTED as to Count IV (breach of contract) but DENIED as to the remaining counts. With respect to Count I, which alleges Defendants violated Section 1 of the Sherman Act, this Court finds that Cloverleaf's allegations that Defendants took concerted action with out-of-state racetracks state a claim upon which relief can be granted. Cloverleaf's allegations that Defendants took concerted action amongst themselves in violation of Section 1, however, fail to state a claim.

<u>BACKGROUND</u>

In ruling on a motion to dismiss, "[t]he factual allegations in the Plaintiff's complaint must be accepted as true and those facts must be construed in the light most favorable to the plaintiff." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

**A.     The Parties**

Plaintiff Cloverleaf is a Maryland corporation that owns and operates Rosecroft Raceway, a standardbred racetrack in Prince George's County, Maryland.[2]  Am. Compl. ¶ 25. Though Rosecroft has historically hosted live standardbred races at its track, in recent years the majority of its revenue has come from off-track betting ("OTB").  *Id*. ¶ 26.  Thus, Rosecroft accepts wagers on live simulcast signals of thoroughbred, standardbred and quarterhorse races held at tracks both within Maryland and out-of-state.  *Id*.  Though Rosecroft is a standardbred racetrack, the most important simulcast signals it receives come from thoroughbred racetracks since these tracks host the most high profile and lucrative races for wagering, such as the Triple Crown and Breeders' Cup races.  *Id*. ¶ 27.  In 2007 and 2008, OTB revenues accounted for approximately 95% of Rosecroft's annual revenue, with 75% of its annual revenue coming specifically from thoroughbred simulcast wagers.  *Id*.

Defendant Horsemen represents, assists and promotes the interests of Maryland thoroughbred owners and trainers.  *Id*. ¶ 4.  Defendant Richard J. Hoffberger is Horsemen's President, and Defendant Alan Foreman is Horsemen's General Counsel.  *Id*. ¶¶ 21, 22. Defendant Horse Breeders similarly represents, assists and promotes the interests of Maryland's thoroughbred breeders.  *Id*. ¶ 5.

Defendants the MJC and LRA operate two thoroughbred racetracks, Pimlico and Laurel Park, both of which are located within 60 miles of Rosecroft in Maryland.[3]  *Id*. ¶ 32.  Defendant Thomas Chuckas, Jr. is the President of MJC, and Defendant Dennis Smoter is the Vice President of MJC.  *Id*. ¶¶ 19, 20.

_____

[2] Cloverleaf Enterprises, Inc. does business as Rosecroft Raceway, thus the terms Cloverleaf and Rosecroft are used interchangeably, and both refer to Plaintiff and Debtor Cloverleaf.  Opp'n 5, n. 4.
[3] The Maryland Jockey Club and the Laurel Racing Association conduct business together and are generally referred to as the MJC.

Defendant TrackNet Media Group, LLC ("TrackNet")[4] is based in Louisville, Kentucky and sells horse-racing content to wagering outlets. *Id.* ¶ 6. TrackNet has an agreement with Cloverleaf to send Rosecroft simulcast signals of thoroughbred races held at a number of racetracks around the country, including Churchill Downs, which hosts the Kentucky Derby the first Saturday in May every year. *Id.* ¶ 7.

### B. Applicable Horseracing Law

The Interstate Horseracing Act ("IHA"), 15 U.S.C. §§ 3001-3007, regulates interstate commerce with respect to horseracing wagers. The IHA imposes conditions on an OTB facility before it can accept wagers on out-of-state races. 15 U.S.C. § 3002(3). Its overarching requirement is that an OTB facility must get consent to accept wagers from both the host state, which is the state where the race is held, and from the home state, which is the state where the OTB facility is located. Am. Compl. ¶ 29; 15 U.S.C. §§ 3004(a)(2). With respect to the host state, an OTB facility must obtain consent from both the host state racetrack and the host state racing commission. Am. Compl. ¶ 30; 15 U.S.C. §§ 3004(a)(1). Notably, the host state racetrack cannot consent to an OTB facility accepting a wager on its races until it has obtained a written agreement with its horsemen's group. Am. Compl. ¶ 32; 15 U.S.C. § 3004(a)(1)(A). With respect to the home state consent, an OTB facility must receive consent from both the home state racing commission and from any tracks within sixty miles of the OTB facility. Am. Compl. ¶¶ 30, 32; 15 U.S.C. §3004(b)(1)(A). In this case, the home state racing commission is the Maryland Racing Commission ("MRC"). Am. Compl. ¶ 25. The only two tracks within 60 miles of Rosecroft are Pimlico and Laurel, both of which are run by the MJC. *Id.* ¶ 32. Thus, in

---

[4] Defendant TrackNet has not joined in either of the pending motions to dismiss, though it has separately moved for summary judgment (Paper No. 125).

order to receive simulcast signals Rosecroft had to receive consent from both the Maryland Racing Commission and the Maryland Jockey Club.

The Maryland Horseracing Act (the "MHA"), Md. Code Ann. Bus. Reg. §§ 11-101, *et seq.*, regulates horseracing wagers in Maryland. The MHA creates the Maryland Racing Commission, which regulates all respects of horse racing in Maryland and must consent to all in-state wagering. Md. Code Ann. Bus. Reg. § 11-201. The Maryland Horseracing Act also requires the approval of MJC, the Horsemen and the Breeders for Laurel or Pimlico to send its signals to Rosecroft. Md. Code Ann. Bus. Reg. §11-811(f).

###### C.    Cross-Breed Agreement

In March 2006, Cloverleaf, the MJC, Horsemen and Horse Breeders entered into the Cross-Breed Agreement (the "Agreement") establishing that Rosecroft, Pimlico and Laurel consented to send and receive simulcast signals on both in-state and out-of-state races. Am. Compl. ¶ 36. Since Pimlico's and Laurel's thoroughbred races are more lucrative than Rosecroft's standardbred races, Cloverleaf agreed to pay the MJC "for the benefit of the thoroughbred industry" (including Horsemen and Horse Breeders) an annual "premium" of $5.9 million, payable in fifty weekly installments of $118,000. *Id*. ¶ 37; Ex. C ¶2. This payment provides Cloverleaf the right "to accept wagers at Rosecroft on all live races conducted at Pimlico Race Course and Laurel Park and all out-of-state thoroughbred races…" *Id*. Ex. C ¶¶ 27, 37. The Cross-Breed Agreement also provides that if "MJC or Cloverleaf fails to make timely payments to the other Party and the failure remains uncured for seven (7) days after written notice thereof is given to the defaulting Party, the Party owed the funds may terminate this Cross-Breed Agreement and/or take such other legal actions as are available to it." *Id*. ¶ 12.

###### D.    Actions of the Parties

Around August 2008, Cloverleaf advised the MJC, Horsemen and Horse Breeders that it could not afford to pay the weekly $118,000 payments it owed under the Agreement because its revenue had declined significantly. Am. Compl. ¶ 38. Cloverleaf and the MJC agreed to a one-time concession payment of $470,000 for 2008 and began to renegotiate the Agreement. *Id.* ¶ 39. The parties were not able to revise the Agreement, however, and negotiations came to an end around March 2009. *Id.* ¶ 41. At that point, Cloverleaf had made no payments to the MJC (including Horsemen and Horse Breeders) for 2009. *Id.* ¶ 40.

On April 28, 2009, the MJC and the Horsemen petitioned the MRC at its regularly-scheduled meeting to revoke its consent to Rosecroft's receipt of simulcast signals of out-of-state races based upon Rosecroft's failure to make the weekly payments the MJC was owed under the Agreement. *Id.* ¶ 44. Cloverleaf contends that its President, Kelley Rogers, heard that this issue was on the meeting's agenda for the first time when he arrived. *Id.* Rogers objected to the revocation of consent because the Commission had not complied with the Maryland Horseracing Act. *Id.* ¶ 44. Nonetheless, the MRC voted over Rogers's objections to withdraw its consent, which meant that Rosecroft could no longer hold betting on thoroughbred races held at out-of-state tracks, including the Kentucky Derby, to be held one day later. *Id.* ¶ 45. The MRC also ordered Cloverleaf to notify out-of-state tracks of its ruling, since out-of-state tracks would be required to cease and desist from providing Cloverleaf its races via simulcast. *Id.*

Cloverleaf contends that immediately following this meeting, Defendant Smoter, MJC's Vice President, sent an email addressed to "Everyone" stating:

> THE MJC AND CLOVERLEAF ARE IN THE MIDST OF A CONTRACT DISPUTE. OUR COMMISSION HAS <u>WITHDRAWN</u> THEIR APPROVAL FOR CLOVERLEAF TO RECEIVE THOROUGHBRED SIMULCASTS. OUR HORSEMEN SUPPORT THIS INITIATIVE.

*Id.* ¶ 46.  This email allegedly included an announcement by the Maryland Jockey Club claiming that the Maryland Racing Commission "voted to withdraw approval of Cloverleaf to import thoroughbred signals, effective midnight, April 29." *Id.*  On April 30, 2009, Defendant TrackNet sent Cloverleaf a letter stating that it would immediately stop sending Rosecroft racing signals of any TrackNet-affiliated thoroughbred racetrack, which included Churchill Downs, home of the Kentucky Derby. *Id.* ¶ 47, 48.

The following day, on May 1, 2009, Defendant Chuckas, the President of the Maryland Jockey Club, wrote to the Maryland Racing Commission and purported to withdraw its consent to Rosecroft's receipt of simulcast signals of out-of-state thoroughbred races. *Id.* ¶ 48.  Chuckas allegedly sent a copy of this letter to the Kentucky Horse Racing Authority and to Churchill Downs in order to "assure that Rosecroft be denied the ability to conduct co-mingled simulcast betting on Churchill Downs programs including without limitation, the Derby Day program." *Id.* Chuckas purportedly also sent a memorandum addressed to "Host Tracks Simulcasting Races to Rosecroft" and "Racing Commissions in Host Track States" stating that Cloverleaf is in "serious breach" of the Agreement, that the MJC objected to and withdrew its previous approval under the Interstate Horseracing Act, that the MJC "specifically object[ed] to the conduct by Rosecroft of co-mingled simulcast betting on any racing programs emanating from your host racetrack and host state" and also that the MJC "request[ed] that you do not allow the conduct of betting by Rosecroft on such racing programs." *Id.* ¶ 49.  Additionally, the MJC and the Horsemen allegedly started running advertisements claiming that the only places in the Washington, D.C./Baltimore area to watch and place wagers on the Kentucky Derby were at Laurel, Pimlico and other satellite OTB facilities. *Id.* ¶ 50.

That same day, on May 1, Cloverleaf filed a motion for a Temporary Restraining Order ("TRO") in the Circuit Court for Prince George's County, Maryland against the MRC's decision, claiming that the MRC's vote was improper because it had not provided Cloverleaf with proper notice and hearing procedures under the Maryland Code. *Id.* ¶ 51; Md. Code Ann., Bus. Reg. §§ 11-308, 11-309. The Circuit Court for Prince George's County issued a TRO at some point that afternoon.[5] *Id.*

Cloverleaf alleges that even after this TRO was issued, late in the evening of May 1, Defendant Dennis Smoter, MJC's Vice President, sent a mass email addressed to "Thoroughbred Simulcast Partners" reiterating that the MJC had withdrawn its consent to Rosecroft and asking "all of our thoroughbred simulcast partners to continue to with hold [sic] their signals." Am. Compl. ¶ 52. Additionally, Alan Foreman, the Horsemen's General Counsel, allegedly called and wrote to out-of-state tracks and horsemen's groups to urge them to terminate their simulcast signals to Rosecroft. *Id.* ¶ 53. By the next day, seventeen of the forty-two out-of-state tracks that had been sending Rosecroft their simulcast signals, including Churchill Downs, ceased doing so. *Id.* ¶¶ 54, 62.

On Saturday, May 2, 2009, the morning of the Kentucky Derby, Cloverleaf obtained a Temporary Restraining Order from this Court enjoining Defendants TrackNet and Churchill Downs from denying the Kentucky Derby simulcast to Rosecroft. *Id.* ¶ 58; *Cloverleaf Enterprises, Inc. v. TrackNet Media Group, LLC, et al.*, No. 09-1133 (D. Md. 2009) (Chasanow, J.), ECF No. 3. As a result, Rosecroft was able to receive the Kentucky Derby simulcast signal, though it only began receiving the signal a couple of hours before the race began. *Id.* ¶¶ 51, 58. Cloverleaf contends that many of Rosecroft's patrons left before the signal came through due to

---

[5] On May 8, 2009, the Circuit Court entered a final injunction, concluding that the MRC failed to provide Cloverleaf proper notice of a hearing and a proper hearing as required by statute.

the uncertainty, which resulted in significant lost revenue. *Id*. ¶¶ 57, 58. On May 7, 2009, Cloverleaf voluntarily dismissed that proceeding. This court approved of the dismissal on May 8, 2009. *See TrackNet,* No. 09-1133, ECF No. 12.

On May 6, 2009, the Horsemen formally withdrew its approval of intertrack wagering at Rosecroft on live races simulcast from Pimlico and Laurel. Am. Compl. ¶ 60. Rosecroft did not receive the simulcast signal for the Preakness Stakes, the next leg of the Triple Crown, which was held on May 16, 2009. *Id*. ¶ 61. On June 3, 2009, Cloverleaf filed a voluntary petition under Chapter 11 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court for the District of Maryland, Greenbelt Division. *Id*. ¶ 2; *In re Cloverleaf Enterprises, Inc*, Ch. 11 Case No. PM 09-20056, Adv. No. 09-00459 (Bankr. D. Md. 2009). Cloverleaf continues in possession of its property and is operating its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. Am. Compl. ¶ 2. Thereafter, Cloverleaf brought this action as an adversary proceeding pursuant to Rule 7015 of the Bankruptcy Rules. By Order of February 22, 2010, this Court granted the Motion to Withdraw the Reference of Adversary Proceeding to the Bankruptcy Court, pursuant to 28 U.S.C. Section 157(d), in light of the claims under the Sherman Act, 15 U.S.C. §§1 and 2, as well as the claims relating to organizations and activities affecting interstate commerce.

On July 6, 2009, Cloverleaf filed its Complaint, which it amended on November 16, 2009, asserting that the Horsemen Defendants and the Jockey Defendants violated federal antitrust laws by engaging in a group boycott (Count I) and attempting to and/or conspiring to monopolize the relevant market (Count II). Cloverleaf also contends that the Horsemen Defendants and the Jockey Defendants engaged in unfair competition (Count III) and that Defendants Horsemen, Horse Breeders and the MJC breached the Cross-Breed Agreement

(Count IV) and tortiously interfered with Cloverleaf's contracts with out-of-state racetracks (Count VI) by revoking consent to Rosecroft's receipt of simulcast signals and encouraging other out-of-state tracks to do the same. Cloverleaf seeks declaratory and other relief under state law (Counts VII, IX, X and XI).[6]

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted; therefore, a Rule 12(b)(6) motion tests the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

A complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* at 555. The plausibility standard requires that the pleader show more than a sheer possibility of success, although it does not impose a "probability requirement." *Twombly*, 550 U.S. at 556. Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Thus, a court must "draw on its judicial experience and common sense" to determine whether the pleader has stated a plausible claim for relief. *Id.* at 1950.

As the Supreme Court explained in *Twombly*, which affirmed the dismissal of an antitrust case for failure to state a claim, to survive a Rule 12(b)(6) motion, a plaintiff need only make

---

[6] Cloverleaf also brings claims for breach of contract (Count V) and injunctive relief (Count VIII) against various out-of-state racetracks and TrackNet. Because none of these defendants joined in the pending motion to dismiss, Counts V and VIII need not be addressed at this point.

sufficient allegations of fact "to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." *Twombly*, 550 U.S. at 556. Accordingly, in antitrust cases, "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 212 (4th Cir. 2002) (quoting *Poller v. Columbia Broadcasting Sys.*, 368 U.S. 464, 473 (1962)); *Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 425 U.S. 738, (1976) (in antitrust cases "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly."). Thus, an antitrust complaint should not be dismissed at the Rule 12(b)(6) stage "merely because the court doubts the plaintiff will ultimately prevail." *Id.* (quoting *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 145 n.8 (4th Cir. 1990) (internal quotation marks omitted)).

<u>ANALYSIS</u>

**I.      Antitrust Claims**

Cloverleaf contends that Defendants breached both § 1 and § 2 of the Sherman Act by engaging in a group boycott and attempting and/or conspiring to monopolize the off-track betting market in Maryland and its surrounding areas.

**A.      Section 1 Claim (Count I)**

Section 1 of the Sherman Act provides, in relevant part, that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C.A. § 1. Thus, to establish a § 1 violation, a plaintiff must show: "(1) a contract, combination or conspiracy; (2) that imposed an unreasonable restraint of trade." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002).

**1.      Conspiracy**

Cloverleaf contends that Defendants conspired among themselves and with others to effectuate a group boycott. The United States Court of Appeals for the Fourth Circuit holds that "'concerted action' in restraint of trade lies at the heart of a Sherman Act section 1 violation." *Virginia Vermiculite, Ltd. v. Historic Green Springs, Inc.*, 307 F.3d 277, 280 (4th Cir. 2002). In other words, § 1 "does not reach conduct that is wholly unilateral." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984) (internal quotation marks omitted). As the Fourth Circuit emphasized in *Virginia Vermiculite*, "concerted activity susceptible to sanction by section 1 is activity in which multiple parties join their resources, rights, or economic power together in order to achieve an outcome that, but for concert, would naturally be frustrated by their competing interests (by way of profit-maximizing choices)." 307 F.3d at 282.

The first question is whether Defendants' actions among themselves could constitute concerted action in violation of the Sherman Act. Cloverleaf contends that Defendants' actions in petitioning the Maryland Racing Commission and refusing to send their simulcast signals to Rosecroft could be found to be concerted action. Under the Maryland Horseracing Act, the Maryland Racing Commission has jurisdiction over all intertrack betting, and must consent to all in-state wagering. Md. Code Ann. Bus. Reg. § 11-808(b). The Maryland Horseracing Act also requires the approval of Maryland Jockey Club, the Horsemen and the Breeders for Laurel or Pimlico to send its signals to Rosecroft. Md. Code Ann. Bus. Reg. §11-811(f). After Cloverleaf and Defendants agreed to a one-time concession payment for 2008, Cloverleaf made no further payments to Defendants as it was obligated to under the Agreement. Thus, at the time Defendants petitioned the MRC to withdraw its consent for Rosecroft to receive Laurel's and Pimlico's simulcast signals, on April 28, 2009, Cloverleaf had not paid Defendants for close to four months. The Agreement provides that in the event of default, "the Party owed the funds

may terminate this Cross-Breed Agreement and/or take such other legal actions as are available to it." Am. Compl. Ex. C ¶ 12. Thus, as an initial matter, Defendants were well within their rights to withdraw their consent to Pimlico or Laurel sending their signals to Rosecroft under the Maryland Horseracing Act after Cloverleaf failed to make its required payments. Accordingly, there is no plausible claim under *Iqbal* and *Twombly* that the actions Defendants allegedly took amongst themselves violated Section 1 of the Sherman Act.

The question remains, however, whether the actions Cloverleaf alleges Defendants took to encourage out-of-state racetracks to deprive Rosecroft of simulcast signals of nationwide thoroughbred horseraces could state a claim for concerted activity in violation of antitrust law. Cloverleaf contends that Defendants joined together with out-of-state racetracks and horsemen's associations to boycott Rosecroft by ensuring Rosecroft would not receive the simulcast of the Kentucky Derby on May 2, 2009. There is no dispute that on the afternoon of May 1, 2009, the Circuit Court for Prince George's County temporarily restrained the Maryland Racing Commission "from preventing or prohibiting Cloverleaf Enterprises, Inc. from accepting simulcast transmissions" and ordered that Cloverleaf "shall be allowed to receive all nature of all simulcast signals from out of state, including the Kentucky Derby, pending further Court action." Am. Compl. Ex. D. Cloverleaf contends that, despite knowledge of the questionable legality of the MRC's vote and this TRO, Defendants nonetheless actively encouraged out-of-state racetracks to boycott Rosecroft. Specifically, Cloverleaf alleges that at some point on the day the TRO was issued:

- the MJC President Chuckas sent a copy of his letter to the MRC withdrawing MJC's consent to Rosecroft's receipt of simulcast signals of out-of-state thoroughbred races to the Kentucky Horse Racing Authority and to Churchill Downs in order to "assure that Rosecroft be denied the ability to conduct co-mingled simulcast betting on Churchill Downs programs including without limitation, the Derby Day program." Am. Compl. ¶ 48.

- Chuckas sent a memorandum addressed to both host tracks and the racing commissions in host track states exclaiming that Cloverleaf was in "serious breach" of the Agreement, that the MJC objected to and withdrew its previous approval under the IHA, and "specifically object[ing] to the conduct by Rosecroft of co-mingled simulcast betting on any racing programs emanating from your host racetrack and host state" and also "request[ing] that you do not allow the conduct of betting by Rosecroft on such racing programs." *Id.* ¶ 49.

- The MJC and the Horsemen started running advertisements claiming that the only places in the Washington, D.C./Baltimore area to watch and place wagers on the Kentucky Derby were at Laurel, Pimlico and other satellite OTB facilities. *Id.* ¶ 50.

It is unclear at this stage whether these alleged actions happened before or after the Circuit Court's TRO was issued on May 1. Cloverleaf specifically contends, however, that late that evening, and after this TRO was issued:

- Defendant Dennis Smoter, MJC's Vice President, sent a mass email addressed to "Thoroughbred Simulcast Partners" reiterating that the MJC had withdrawn its consent to Rosecroft and asking "all of our thoroughbred simulcast partners to continue to with hold [sic] their signals." *Id.* ¶ 52.

- Alan Foreman, the Horsemen's General Counsel, called and wrote to out-of-state tracks and horsemen's groups to urge them to terminate their simulcast signals to Rosecroft. *Id.* ¶ 53.

Thus, whether or not the Circuit Court's TRO was correct in halting the MRC from withdrawing its consent, Cloverleaf's allegations are sufficient to state a claim that both the MJC and the Horsemen engaged in concerted activity with out-of-state racetracks by requesting that they stop sending their simulcast signals to Rosecroft despite the TRO.[7]

In response, the Horsemen Defendants contend that even if Defendants complained to out-of-state tracks or horsemen's associations about Cloverleaf's breach and their subsequent withdrawal of Laurel's and Pimlico's simulcast signal, their complaints do not rise to the level of

_____

[7] Since this Court finds Cloverleaf successfully states a claim that Defendants participated in concerted activity with the host tracks, it need not analyze Defendants' arguments regarding the MJC's and Horsemen's "unity of interest," or whether they are competitors.

creating an inference of conspiracy in violation of the Sherman Act. Accordingly, Defendants

claim that Cloverleaf has not pled that Defendants "had a conscious commitment to a common

scheme designed to achieve an unlawful objective" as required by *Monsanto Co. v. Spray-Rite

Serv. Corp*., 465 U.S. 752, 768 (1984). As an initial matter, *Monsanto* is distinguishable because

it addresses whether an antitrust plaintiff provided sufficient *evidence* of a concerted action such

that it could survive a motion for a directed verdict. The question in this case is not whether

Cloverleaf provided sufficient evidence of concerted action, but whether it has made sufficient

*allegations* of concerted action to survive the motion to dismiss stage. Furthermore, in *Monsanto*

the Supreme Court affirmed the jury verdict *in favor* of the antitrust plaintiff, finding that it had

presented sufficient evidence of concerted action. In its analysis, the Supreme Court explained

that evidence that defendant distributors complained to manufacturers about the plaintiff

distributor's prices could not, without more, create an inference of a conspiracy. *Id*. 763.

Instead, "evidence must be presented both that the distributor communicated its acquiescence or

agreement, and that this was sought by the manufacturer." *Id*. at 764, n. 9.

In this case, Cloverleaf alleges that the Defendants did more than just complain to out-of-

state racetracks and horsemen's associations that Plaintiffs were in arrears. Cloverleaf claims

that Defendants went one step further and specifically requested that the host tracks and

horsemen's groups follow its lead and refuse to send their simulcast signals to Rosecroft. There

is no dispute that by the following day at least seventeen out-of-state tracks had ceased sending

simulcast signals to Rosecroft, including Churchill Downs. *Id*. ¶ 54. As a result, Cloverleaf

alleges the kind of actions that Monsanto requires; Defendants asked out-of-state racetracks to

stop sending their simulcast signals to Rosecroft, and at least seventeen of the tracks

communicated their acquiescence or agreement the following day by doing just that. *See also*

*Dickson v. Microsoft Corp.*, 309 F.3d 193, 205 (4th Cir. 2002) (holding that co-conspirators need

not share the same motive or goal; it is sufficient to allege that the co-conspirators "acquiesced in

an illegal scheme.") (quoting *United States v. Paramount Pictures, Inc*., 334 U.S. 131, 161;

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co*., 156 F.3d 535, 541 (4th Cir. 1998) ("It is not

necessary that [Historic Green Springs, Inc.] have shared Grace's alleged anticompetitive motive

in entering into a proscribed restraint; it is sufficient that HGSI, regardless of its own motive,

merely acquiesced in the restraint with the knowledge that it would have anticompetitive

effects.").  Though the Defendants contend that that this is mere parallel conduct and point out

that, unsurprisingly, "none of those [out-of-state] tracks communicated any information to

Cloverleaf that the Horsemen Defendants had urged them to [cease transmitting their signals],"

this is a factual dispute not to be resolved in a motion to dismiss.

### 2.        Unreasonable Restriction

Cloverleaf contends that the Defendants' alleged boycott imposed an unreasonable

restraint of trade in interstate commerce.  Courts generally evaluate whether a restraint is

unreasonable under one of two approaches: the *per se* rule or the rule of reason.  Under the *per se*

approach, there is a "conclusive presumption that the restraint is unreasonable."  *See Arizona v.

Maricopa County Med. Soc'y,* 457 U.S. 332, 343-45 (1982).  Under the rule of reason approach,

by contrast, a factfinder must "decide whether under all the circumstances of the case the

restrictive practice imposes an unreasonable restraint on competition."  *Id*. 343.  Cloverleaf

contends that Defendants' boycott imposed an unreasonable restraint of trade under either

approach.

The Supreme Court has long held that "certain concerted refusals to deal or group

boycotts are so likely to restrict competition without any offsetting efficiency gains that they

should be condemned as per se violations of § 1 of the Sherman Act." *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 290 (1985) (citing cases). Group boycott cases to which the Supreme Court has applied this approach typically involve "joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." *Id.* 294. Since a boycott has consistently been held as a *per se* illegal horizontal agreement, this Court only addresses the viability of that contention within the pending motion to dismiss.

Cloverleaf contends that the alleged group boycott is similar to boycotts that have been held to be *per se* violations. In *Churchill Downs Inc. v. Thoroughbred Horsemen's Group, LLC*, 605 F. Supp. 2d 870, 891 (W.D. Ky. 2009), for example, horse track operators asserted antitrust claims against horsemen's groups, alleging that the groups collectively pressured the operators to pay a minimum price in order to obtain the horsemen's consent to receive simulcast signals for wagering purposes. That court reasoned that if the operators did not assent to the horsemen's demands, they would be "precluded from purchasing a signal from any track whose local horsemen's group participates in the [unlawful] scheme." *Id.* In this case, the Amended Complaint alleges that the Defendants' concerted action deprived Cloverleaf of the ability to receive simulcast signals, which are crucial to Cloverleaf's ability to compete in the market for wagering on horse races held at tracks both within and outside of Maryland. As the *Churchill Downs* Court determined, "if true, this arrangement seems synonymous with" anticompetitive restraints that courts have identified as *per se* violations. *Id.* Thus, Cloverleaf has stated enough to allege Defendants' actions resulted in an unreasonable restriction of trade. Accordingly, this Court denies Defendants' motions to dismiss Cloverleaf's Section 1 claim.

**B.      Section 2 Claim (Count II)**

Cloverleaf contends that Defendants "illegally attempted to monopolize and combined and conspired to monopolize, among themselves and with others, the market for simulcast wagering on out-of-state and in-state races in the relevant geographic market," and that these actions "violate Section 2 of the Sherman Act."  Am. Compl. ¶¶ 76, 77.  Section 2 of the Sherman Act provides in part: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C. § 2.  Thus, this Court must separately address Cloverleaf's claims that Defendants attempted to monopolize and conspired to monopolize the relevant market.

**1.      Attempted Monopolization**

To state a claim for attempted monopolization, a plaintiff must demonstrate: "(1) a specific intent to monopolize the relevant market; (2) predatory or anticompetitive acts in furtherance of the intent; and (3) a dangerous probability of success."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *In re Microsoft Corp. Antitrust Litigation*, 333 F.3d 517 (4th Cir. 2003).

**a.      Specific Intent to Monopolize a Relevant Market**

Cloverleaf's factual allegations with respect to the relevant markets and Defendants' control of the market must be accepted as true at this point.  *See Adams v. Bain*, 697 F.2d 1213, 1216 (4th Cir. 1982).  Cloveleaf contends that after being driven out of business, Defendants control all but one of the OTB facilities in Maryland.  As a result, patrons have no reasonable alternative to wagering on out-of-state races in the relevant market, which Cloverleaf defines as "the State of Maryland, the District of Columbia, and other areas within reasonable geographic

proximity of travel to OTB locations within the state of Maryland." Am. Compl. ¶ 67. These allegations could, if proven, support a finding that Defendants had a specific intent to monopolize the relevant wagering market.

### b. Predatory or Anticompetitive Acts

Cloverleaf contends that the actions Defendants took to stop Laurel, Pimlico and various out-of-state racetracks from sending Rosecroft their simulcast signals are predatory and anticompetitive acts designed to acquire and maintain a monopoly in the relevant OTB markets. In *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), the Supreme Court reiterated the established proposition that a plaintiff must show that the defendant's conduct was "exclusionary," "anticompetitive," or "predatory" to prevail on a § 2 monopolization claim. *Id.* at 602. As explained above, Cloverleaf alleges that Defendants encouraged myriad out-of-state tracks and horsemen's groups to cease sending simulcast signals to Rosecroft the day before the Kentucky Derby, typically the most lucrative horserace of the year for OTB facilities. The alleged purposeful exclusion of Rosecroft from gaining access to Defendants' and out-of-state racetracks' simulcasts constitutes the type of circumstance that can give rise to antitrust liability. *See Advanced Health-Care Servs. v. Radford Community Hosp.,* 910 F.2d 139, 149 (4th Cir. 1990). Accordingly, Cloverleaf has alleged a plausible claim under *Iqbal* and *Twombly* that "the monopolist made a deliberate effort to discourage its customers from doing business with its smaller rival." *Aspen Skiing*, 472 U.S. at 610.

### c. Dangerous Probability of Successful Monopolization

Cloverleaf alleges that with Rosecroft out of business, Defendants have a monopoly on OTB betting in Maryland and its surrounding areas. Rosecroft, which was already in financial straits before the Kentucky Derby, contends that it lost a large number of its patrons on Derby

day due to the uncertainty that it would receive the simulcast signal from Churchill Downs. Rosecroft claims that because of Defendants' actions it subsequently lost over half its out-of-state simulcast signals and it is a matter of record that Cloverleaf has since filed for bankruptcy. Thus, Cloverleaf has alleged even more than a dangerous probability of success, but instead that Defendants were actually successful in putting Rosecroft out of business. Accordingly, Cloverleaf states a claim for attempted monopolization with sufficient specificity to survive a motion to dismiss.

### 2. Conspiracy to Monopolize

To state a claim for conspiracy to monopolize, a plaintiff must allege (1) concerted action; (2) a specific intent to achieve an unlawful monopoly; and (3) commission of an overt act in furtherance of the conspiracy. *Radford*, 910 F.2d at 149. Unlike an attempted monopolization claim, it is not necessary that overt acts be predatory. *Id.* This Court has already found the first two elements of this claim. As to the third, Cloverleaf claims that Defendants committed an overt act in furtherance of the alleged conspiracy by encouraging out-of-state racetracks and horsemen's groups via email and telephone to stop sending Rosecroft their simulcast signals. Therefore, Cloverleaf has stated a colorable claim of illegal conspiracy to monopolize upon which relief might be granted. Accordingly, this Court denies Defendants' motions to dismiss Cloverleaf's Section 2 claim.

### C. Antitrust Immunity

Defendants contend the *Noerr-Pennington* doctrine shields their petitions to the MRC from antitrust liability. The *Noerr-Pennington* doctrine states that horizontal competitors may join together to lobby the government because antitrust violations cannot be predicated on attempts to influence the passage or enforcement of laws. *See Eastern R.R. President's*

*Conference v. Noerr Motor Freight*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965). The underpinning of *Noerr* and its progeny is that Congress did not intend to subject to antitrust liability actions that had the immediate purpose of influencing legitimate governmental decision-making processes. *See A Fisherman's Best v. Rec. Fishing Alliance*, 310 F.3d 183, 189 (4th Cir. 2002). Thus, the doctrine provides immunity to those who petition the government for redress. *Id.*

Defendants claim that their petitioning the MRC is protected conduct since they were merely petitioning the government for redress. *Noerr* immunity does not, however, apply to petitions that are a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Noerr*, 365 U.S. at 144. Cloverleaf claims that Defendants knew their petition to the MRC was improper, and that Defendants petitioned the MRC the day before the Kentucky Derby solely to make it impossible for Rosecroft to receive a simulcast signal of the Derby. As the Supreme Court explained in *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 380 (1991), "A classic example [of a sham] is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay."

Cloverleaf's complaint alleges certain facts and motives with respect to the Defendants when petitioning the Maryland Racing Commission. In addressing the pending Motions to Dismiss, these allegations "must be accepted as true and those facts must be construed in the light most favorable to the plaintiff." *Edwards*, 178 F.3d at 244. Cloverleaf's allegations suggest a "sham" in the filing of the petitions with the Commission. Whether Defendants can invoke the *Noerr-Pennington* doctrine depends upon a factual record which must await discovery in this case. Finally, this Court notes that even if Defendants are able to invoke the *Noerr-*

*Pennington* doctrine after discovery, it would only protect Defendants' actions in petitioning the Maryland Racing Commission, not the steps Defendants allegedly took to contact out-of-state racetracks as there is no indication that those actions were taken for the purpose of influencing governmental decision-making.

Defendants also contend that the Interstate Horsemen's Act offers them implied immunity from the application of antitrust laws. Yet, the legislative history of the IHA suggests there is no antitrust immunity:

> This legislation in no way modifies or affects the scope or application of the antitrust laws of the United States, nor does it confer upon any person or persons the right to enter into any agreement in restraint of trade which would be prohibited under the antitrust laws.

H.R. Rep. No. 1733, 95th Cong., 2d Sess., at 4 (1978). As the Horsemen Defendants acknowledge, "[t]here are only a handful of decisions addressing the IHA in the context of an antitrust action, and the law is far from fully developed." Horsemen Reply 20, n. 8. In fact, of the three cases that discuss the issue of antitrust immunity under the IHA, none have held that it applies. In two of these cases, the courts decline to find antitrust immunity at the 12(b)(6) stage: In *Saratoga Harness Racing*, 1997 WL 135946, at *6 (N.D.N.Y. March 18, 1997), the Court held that discovery was necessary before determining antitrust immunity because "questions of fact and law pervade the analysis to such an extent that the court is unprepared to rule at this stage whether the IHA provides a defense to conduct forbidden by the Sherman Act." Similarly, in *Churchill Downs Inc. v. Thoroughbred Horsemen's Group, LLC*, 605 F. Supp. 2d 870 (W.D. Ky. 2009), the court recognized that "[t]he IHA's legislative framework suggests that antitrust immunity should not be implied here," and noted that "this Court is not persuaded that Congress expressed any intent to apply or repeal the antitrust laws through its enactment of the IHA." *Id.* at 882; 885 n.22. The third case, *Hialeah, Inc. v. FHBPA,* 899 F. Supp. 616 (S.D. Fla. 1995),

rejects antitrust immunity outright: "the Court recognizes that the IHA provides no immunity to any party from federal antitrust law, nor does the legislative history indicate that this was Congress' intent." *Id*. 621. Accordingly, this Court shall not determine at the motion to dismiss stage whether Defendants' conduct is immune from antitrust law.

## II.    State Law Claims

### A.    Unfair Competition (Count III)

Cloverleaf contends that Defendants engaged in unfair competition by refusing "to deal with [Cloverleaf] and conspiring to withdraw consents and simulcast signals that [Cloverleaf] requires in order to conduct its business activities." Am. Compl. ¶ 82. Thus, Cloverleaf's unfair competition claims are based upon the same allegations that form the basis of its antitrust claims. Under Maryland law, a claim for unfair competition can encompass "damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort. . . . What constitutes unfair competition in a given case is governed by its own particular facts and circumstances." *Sun Dun, Inc. v. Coca-Cola Co.*, 740 F. Supp. 381, 397 (D. Md. 1990) (quoting *Baltimore Bedding Corp. v. Moses*, 182 Md. 229, 237 (1943)). As explained in Section I, Cloverleaf has alleged Defendants engaged in "unfair methods" as necessary to set forth a claim for unfair competition. Moreover, this Court has held that "a violation of antitrust laws could itself constitute unfair competition." *Id*; *see also Berlyn, Inc. v. Gazette Newspapers, Inc*., 157 F. Supp. 2d 609, 624 (D. Md. 2001). The Horsemen similarly acknowledge that Cloverleaf's unfair competition claim is "tethered" to the antitrust claims. Horsemen Mot. Dismiss 38. Thus, this count must stand so long as Cloverleaf has viable antitrust claims. Consequently, Defendants' motions to dismiss Count III are denied.

### B.    Breach of Contract (Count IV)

Cloverleaf contends that Defendants Horsemen, Horse Breeders and the MJC breached the Cross-Breed Agreement when they refused to consent to Rosecroft's receipt of simulcast signals "as required" under the Agreement.[8] Am. Compl. ¶ 90. Since the MJC has requested further time to answer this claim, this Court will only address the breach of contract claim as to Defendants Horsemen and Horse Breeders.

The Agreement was entered into by Cloverleaf, the MJC, Horsemen and Horse Breeders. It sets out the terms and conditions under which Cloverleaf, as owner of Rosecroft, and MJC, as the owner of Laurel and Pimlico, conduct cross-breed simulcasting and operate existing OTB facilities. Under the Agreement, these parties granted each other consent for the simulcast of thoroughbred and standardbred races until December 31, 2021. Am. Compl. Ex. C ¶ 1. In exchange, Cloverleaf, as owner of a racetrack that runs far less lucrative races than Pimlico and Laurel, agreed to pay $5.9 million annually to the MJC in weekly installments of approximately $118,000. *Id.* ¶ 2. Importantly, in the event of default, the Agreement states that "the Party owed the funds may terminate this Cross-Breed Agreement and/or take such other legal actions as are available to it." *Id.* ¶ 12.

The Maryland Horseracing Act requires that Rosecroft must obtain the approval of the Horsemen and Horse Breeders for Laurel and Pimlico to send its simulcast signals to Rosecroft. MHA § 11-811(f). The Agreement does not contain any term that prohibits the Horsemen or Horse Breeders from withdrawing their consent under the MHA to the intrastate transmission of races. On the contrary, the Agreement explains that in the event Cloverleaf fails to make payments, the MJC, Horsemen and Horse Breeders may take legal actions against it. After Cloverleaf had failed to make payments for approximately four months, the Horsemen and Horse

---

[8] Cloverleaf also contends the Horsemen, Horse Breeders and MJC breached the agreement "by actively encouraging others to deprive Rosecroft of simulcast signals." Am. Compl. ¶ 90. This allegation is merely a repetition of Cloverleaf's antitrust claim, however.

Breeders took the legal action[9] available to it by withdrawing its consent under the MHA for Laurel and Pimlico to send its signals to Rosecroft. These actions were patently appropriate under the Agreement. Accordingly, Cloverleaf's breach of contract claim against the Horsemen and Horse Breeders must be dismissed as it fails to state a plausible claim for relief.

### C. Tortious Interference with Contract (Count VI)

Cloverleaf brings a claim for tortious interference with contract against the Horsemen, Horse Breeders and the MJC contending that they "have directed and have attempted to direct the Out-of-State Racetrack Defendants to cease providing simulcast signals to [Cloverleaf] in violation of" various agreements Cloverleaf contends it has with out-of-state tracks. Am. Compl. ¶ 98. Under Maryland law, in order to state a claim for tortious interference with contract a plaintiff must allege: "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants; and (4) actual damage and loss resulting." *S. Volkswagen, Inc. v. Centrix Fin*., LLC, 357 F. Supp. 2d 837, 850-851 (D. Md. 2005). The two general types of tort actions for interference with contract are inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract." *Natural Design, Inc. v. Rouse Co*., 302 Md. 47, 485 A.2d 663, 674 (Md. 1984). Cloverleaf alleges the latter tort action.

Cloverleaf contends that defendants Horsemen, Horse Breeders and the MJC purposely directed out-of-state tracks to breach their existing contractual obligations to send simulcast signals to Rosecroft and that those out-of-state tracks did, in fact, cease sending signals to Rosecroft. These allegations are sufficient to allege a tortious interference with contract claim.

---

[9] As explained above, in light of Cloverleaf's breach, Defendants' withdrawal of their consent by itself is not an antitrust violation.

*See, e.g., Sun Dun, Inc. v. Coca-Cola Co.*, 740 F. Supp. 381, 398 (D. Md. 1990) ("Because the Court has found that some of plaintiff's antitrust claims are sufficient to withstand defendants' motions to dismiss, the claim for tortious interference likewise must remain."). Defendants' motions to dismiss Count VI are therefore denied.

### D. Declaratory Judgment (Count VII)

Cloverleaf seeks that this Court issue a declaratory judgment that the Agreement is binding on these parties until it expires on December 31, 2021. Am. Compl. ¶ 106. At present, the status of the contract is unclear. It appears that the parties are continuing to operate under the contract, but more discovery is necessary on this issue. It would be premature to dismiss Cloverleaf's declaratory judgment count at this time. Accordingly, Defendants' motions to dismiss Cloverleaf's declaratory judgment claim are denied.

<u>CONCLUSION</u>

For the reasons stated above, the Jockey Defendants' Partial Motion to Dismiss (Paper No. 109) is DENIED, with those defendants being granted an extension of time to respond to Counts IV (breach of contract) and IX (right of setoff). The Horsemen Defendants and the Horse Breeders' Motion to Dismiss (Paper No. 110) is GRANTED as to Count IV (breach of contract) but DENIED as to the remaining counts. With respect to Count I, which alleges Defendants violated Section 1 of the Sherman Act, this Court finds that Cloverleaf's allegations that Defendants took concerted action with out-of-state racetracks state a claim upon which relief can be granted. Cloverleaf's allegations that Defendants took concerted action amongst themselves in violation of Section 1, however, fail to state a claim.

A separate Order follows.

Dated:        August 6, 2010                    /s/_____
                                               Richard D. Bennett

United States District Judge