IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CLOVERLEAF ENTERPRISES, INC.,   *

   Plaintiff,   *

   v.   *   Civil Action No.: RDB 10-407

MARYLAND THOROUGHBRED,   *
HORSEMEN'S ASSOCIATION, INC., *et al.*,
  *

   Defendants.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

Plaintiff and Debtor Cloverleaf Enterprises, Inc. ("Cloverleaf"), which owns Rosecroft Raceway ("Rosecroft"),[1] a Maryland Standardbred racetrack, brings this suit asserting eleven antitrust and breach of contract claims against eighteen defendants - primarily racetracks, horsemen's associations and individuals that work for them. At issue in this motion is the sole claim Cloverleaf brings against Defendants TrackNet Media Group, LLC ("TrackNet"), Churchill Downs Incorporated, Churchill Downs Incorporated t/a Arlington Park, Churchill Downs Incorporated t/a Calder Race Course and Churchill Downs Racetrack (collectively, "Churchill Downs") for breach of contract. Presently pending before this Court is Defendants TrackNet and Churchill Downs' Motion for Summary Judgment. The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2010). For the reasons that follow, Defendants' Motion for Summary Judgment (Paper No. 125) is GRANTED.

---

[1] On June 3, 2009, Cloverleaf filed for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for this District. Cloverleaf continued in possession of its property and is operating its business as a debtor in possession, pursuant to the Bankruptcy Code, 11 U.S.C. §§ 1107 & 1108.

BACKGROUND

This Court reviews the facts relating to this claim in the light most favorable to the petitioner. *See, e.g., Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

This case involves a dispute between Cloverleaf[2] and certain Maryland Thoroughbred horseracing entities and individuals, including The Maryland Jockey Club of Baltimore City, Inc. ("MJC"), the Maryland Thoroughbred Horsemen's Association, Inc. ("Horsemen") and the Maryland Horse Breeders Associations, Inc. ("Breeders"). The brunt of Cloverleaf's eleven-count Amended Complaint is brought against these parties, who Cloverleaf contends violated federal antitrust laws, engaged in unfair competition and tortiously interfered with Cloverleaf's contracts with out-of-state racetracks.

Cloverleaf brings one count for breach of contract against Defendants TrackNet and Churchill Downs (collectively, "Defendants").[3] Defendant TrackNet is an agent authorized by certain racetracks to sell horseracing content to wagering outlets, including other racetracks. Summ. J. Mem. Ex. 2 ¶ 3. Defendant Churchill Downs is one of the racetracks for which TrackNet is an agent. *Id.* In 2007, Cloverleaf entered into a Simulcast Agreement with Defendants whereby TrackNet agreed to provide horseracing content to Rosecroft from various racetracks, including Churchill Downs in Kentucky. *Id.* ¶ 5. Cloverleaf's sole claim against these two defendants is that they breached the Simulcast Agreement when they stopped authorizing the transmission of Thoroughbred simulcast signals to Rosecroft. Am. Compl. Count V.

---

[2] Cloverleaf Enterprises, Inc. does business as Rosecroft Raceway, thus the terms Cloverleaf and Rosecroft are used interchangeably, and both refer to Plaintiff and Debtor Cloverleaf. Opp'n 5, n. 4.

[3] On December 23, 2009, Cloverleaf voluntarily dismissed its tortious interference with contract claim against TrackNet. Summ. J. Mem. Ex. 19.

### A. The Interstate Horseracing Act of 1978

The Interstate Horseracing Act of 1978 ("the Act'") requires Cloverleaf to receive consent from its state racing commission and any currently operating track within sixty miles in order to receive out-of-state simulcast Thoroughbred races. Summ. J. Mem. Ex. 9, 15 U.S.C. § 3001(a)(3). Rosecroft's state racing commission is the Maryland Racing Commission ("MRC"), and the only two racetracks within sixty miles of Rosecroft are Pimlico Race Course and Laurel Park, both of which are owned by MJC. *See id.*, §§ 3004(a)(3) and (b)(1)(A). Thus, Rosecroft has to receive the approval of the MRC and the MJC in order to receive out-of-state simulcast signals through TrackNet or any other agents of Thoroughbred horse racing.

### B. The Cross-Breed Agreement

In March 2006, Cloverleaf, the MJC, Horsemen and Breeders entered into a Cross-Breed Agreement, which establishes that Rosecroft, Pimlico and Laurel consent to send and receive simulcast signals on both in-state and out-of-state races. Since Pimlico's and Laurel's Thoroughbred races are more lucrative than Rosecroft's Standardbred races, Cloverleaf agreed to pay the MJC "for the benefit of the thoroughbred industry" an annual "premium" of $5.9 million, payable in fifty weekly installments of $118,000. Summ. J. Mem. Ex. 10 ¶ 2. This payment provides Cloverleaf the right "to accept wagers at Rosecroft on all live races conducted at Pimlico Race Course and Laurel Park and all out-of-state thoroughbred races…" *Id.* ¶¶ 27, 37. The Cross-Breed Agreement also provides that if "MJC or Cloverleaf fails to make timely payments to the other Party and the failure remains uncured for seven (7) days after written notice thereof is given to the defaulting Party, the Party owed the funds may terminate this Cross-Breed Agreement and/or take such other legal actions as are available to it." *Id.* ¶ 12.

### C. The Simulcast Agreement

On April 3, 2007, TrackNet and Cloverleaf entered into the aforementioned Simulcast Agreement, whereby TrackNet agreed to distribute horseracing content to Rosecroft from Defendant racetracks Arlington Park in Illinois, Calder Race Course in Florida, and Churchill Downs in Kentucky, as well as other racetracks in Maryland, including Pimlico and Laurel. *Id*. ¶ 5. Under the Simulcast Agreement, the parties consent to "satisfy all necessary requirements of the Interstate Horseracing Act of 1978." Summ. J. Mem. Ex. 4 at 12. The Agreement also states that it shall be "automatically terminated . . . upon the failure to obtain or withdrawal of any approvals required by any applicable law as to the transactions contemplated hereby." *Id*. Ex. 3 at 12.

### D. Cloverleaf Defaults

In 2006, 2007 and 2008, Cloverleaf paid the $5.9 million premium it was required to pay under the Cross-Breed Agreement. Summ. J. Mem. Ex. 11, at ¶¶ 6-7. It did not, however, pay any part of the fee in 2009. *Id*. ¶ 8; Ex. 12 at 12-13. On April 21, 2009, the MJC, Horsemen and Breeders notified Cloverleaf that it was in default of the Cross-Breed Agreement. *Id*. Ex. 13. On April 28, 2009, the MJC and Horsemen successfully petitioned the MRC at its regularly-scheduled meeting to revoke its consent to Rosecroft's receipt of simulcast signals of out-of-state races based upon Cloverleaf's failure to make the weekly payments. *Id*. Ex. 14. On April 29, 2009, the MRC withdrew its consent for Rosecroft to accept interstate off-track wagers on Thoroughbred racing under § 3004 of the Act. *Id*. Ex. 2(B). That same day, after TrackNet received the MRC's letter withdrawing its consent for Rosecroft to accept interstate off-track wagers, TrackNet sent a letter to Rosecroft CEO Kelley Rogers informing him that in accordance with the Simulcast Agreement, TrackNet could no longer send Rosecroft the racing signal of any Thoroughbred TrackNet racetrack. *Id*. Ex. 2(C). On May 1, 2009, the MJC notified Rosecroft

and the MRC that they were also withdrawing their consent under the Act. *Id*. Ex. 2(D). On June 5, 2009, Rogers wrote to TrackNet and acknowledged that Cloverleaf was no longer paying the fee it was required to pay under the Cross-Breed Agreement, but contending that it no longer needed Pimlico's and Laurel's -- and thus MJC's -- approval to receive TrackNet's signal. *Id*. Ex. 2(L). Accordingly, Rogers asked that TrackNet "consider once again sending [the TrackNet Racetracks'] signal to Rosecroft." *Id*.

### E. Cloverleaf's Initial Litigation and Bankruptcy Proceedings

On May 1, 2009, Cloverleaf filed a motion for a Temporary Restraining Order ("TRO") in the Circuit Court for Prince George's County, Maryland against the MRC as a result of the MRC's decision to withdraw its consent. Summ. J. Mem. Ex. 15. Cloverleaf claimed that the MRC's vote was improper because it had not provided Cloverleaf with proper notice and hearing procedures under the Maryland Code. *Id*.; Md. Code Ann., Bus. Reg. §§ 11-308, 11-309. The Circuit Court for Prince George's County issued a TRO at some point that afternoon.[4] *Id*.

At 4:25 p.m. on Saturday, May 2, 2009, the day of the Kentucky Derby, Cloverleaf obtained a Temporary Restraining Order from this Court enjoining Defendants TrackNet and Churchill Downs from denying the Kentucky Derby simulcast to Rosecroft. Summ. J. Mem. Ex. 16; *Cloverleaf Enterprises, Inc. v. TrackNet Media Group, LLC, et al.*, No. 09-1133 (D. Md. 2009) (Chasanow, J.), ECF No. 3. TrackNet immediately resumed service of the simulcast signals, thereby allowing Rosecroft to receive the Kentucky Derby simulcast signal. On May 7, 2009, on the eve of the preliminary injunction hearing, Cloverleaf voluntarily dismissed that proceeding and dissolved the May 2 Temporary Restraining Order. Summ. J. Mem. Ex. 17. This court approved of the dismissal on May 8, 2009. *Id.* As a result of the dissolution of the

---

[4] On May 8, 2009, the Circuit Court entered a final injunction, concluding that the MRC failed to provide Cloverleaf proper notice of a hearing and a proper hearing as required by statute.

5

TRO, TrackNet stopped authorizing the transmission of its Thoroughbred racing simulcast signals to Rosecroft since MJC's withdrawal of consent was still in effect and has not authorized transmission of the signals since.

On June 3, 2009, Cloverleaf filed a voluntary petition under Chapter 11 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court for the District of Maryland, Greenbelt Division. *In re Cloverleaf Enterprises, Inc*, Ch. 11 Case No. PM 09-20056, Adv. No. 09-00459 (Bankr. D. Md. 2009). Cloverleaf filed an emergency motion for TRO and preliminary injunction against the Horsemen and Breeders for interfering with its right to receive simulcast signals and directing the out-of-state racetracks to restore the signals. On July 16, 2009, following a hearing, Bankruptcy Judge Mannes denied the motion for a TRO, and Cloverleaf later dismissed the motion for preliminary injunction. Summ. J. Mem. Ex. 18.

Cloverleaf brought this action as an adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7015. By Order of February 22, 2010, this Court granted the Motion to Withdraw the Reference of Adversary Proceeding to the Bankruptcy Court, pursuant to 28 U.S.C. § 157(d), in light of Cloverleaf's claims under the Sherman Antitrust Act, 15 U.S.C. §§ 1 & 2 ("Sherman Act"), as well as claims relating to organizations and activities affecting interstate commerce.

### F. Cloverleaf's Current Litigation

The thrust of Cloverleaf's action is brought against Defendants MJC, the Laurel Racing Association, LP ("LRA"), Thomas Chuckas, Jr. and Dennis Smoter (collectively, "Jockey Defendants"), and the Horsemen, Richard J. Hoffberger and Alan Foreman (collectively, "Horsemen Defendants"). Cloverleaf alleges that those defendants violated the Sherman Act by engaging in a group boycott orchestrated to destroy competition in off-track betting and to

monopolize the off-track betting market and in doing so engaged in a breach of contract. On February 25, 2010, the Horsemen Defendants and the Jockey Defendants separately moved to dismiss Cloverleaf's antitrust claims under federal law, and unfair competition and tortious interference with contract claims under Maryland law. Paper Nos. 109 & 110. Defendants Horsemen and the Breeders also moved to dismiss Cloverleaf's breach of contract claim. Paper No. 110. On July 29, 2010, oral argument was presented to this Court on both motions. On August 6, 2010, this Court issued an Order and accompanying Memorandum Opinion denying the Jockey Defendants' Partial Motion to Dismiss, granting the Horsemen Defendants and Breeders' Motion to Dismiss as to Cloverleaf's breach of contract claim (Count IV) but denying it as to the remaining counts. Paper Nos. 133 & 134.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.

In undertaking this inquiry, a court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986).  After the moving party has established the absence of a genuine issue of material fact, the nonmoving party must present evidence in the record demonstrating an issue of fact to be resolved at trial.  *Pension Ben. Guar. Corp. v. Beverley*, 404 F.3d 243, 246-47 (4th Cir. 2005) (citing *Pine Ridge Coal Co. v. Local 8377, UMW,* 187 F.3d 415, 422 (4th Cir. 1999)).  Summary judgment will be granted if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

This Court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial.  *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)).  If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted.  *Anderson*, 477 U.S. at 249-50.  This Court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences."  *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md.  2001) (citations omitted).

ANALYSIS

**I.      TrackNet Did Not Breach the Simulcast Agreement**

Cloverleaf alleges that TrackNet's and Churchill Downs' failure or refusal to provide Thoroughbred racing signals to Rosecroft is a breach of the Simulcast Agreement.  *See* Ex. 15, Am. Compl at ¶¶ 93-94.  The "Governing Law" provision of the Simulcast Agreement states that the "validity, interpretation and legal effect of this Agreement" will be governed by the laws of the state in which the "Host" track is licensed.  Summ. J. Mem. Ex. 4 at 17.  Since the host track in this case is Churchill Downs, which is licensed to conduct horseracing in Kentucky, Kentucky law applies.  *Id*. at 26.

In Kentucky, the interpretation of a contract is a question of law to be decided by the Court. *Hibbitts v. Cumberland Valley Nat'l Bank & Trust Co.*, 977 S.W.2d 252, 254 (Ky. Ct. App. 1998). Where a contract is free from ambiguity, "it needs no construction and will be performed or enforced in accordance with its express terms." *Ex parte Walker's Ex'r Ky.*, 68 S.W.2d 745, 747 (Ky. 1933). "Even if one of the contracting parties may have intended a different result, a contract cannot be interpreted in discordance with the plain meaning of the terms of the contract." *Abney v. Nationwide Mut. Ins. Co.*, 215 S.W.3d 699, 703 (Ky. 2006).

The Simulcast Agreement "automatically terminated . . . upon the failure to obtain or withdrawal of any approvals required by any applicable laws as to the transactions contemplated hereby." Summ. J. Mem. Ex. 3 at ¶ 16(A). Thus, the Simulcast Agreement terminated with respect to TrackNet's racing content when the MRC withdrew its consent on April 29, 2009 and when the MJC withdrew its consent on May 1, 2009. Once the Simulcast Agreement terminated, TrackNet had no obligation to authorize transmission of the Thoroughbred simulcast signals to Rosecroft from the TrackNet racetracks, including Churchill Downs. Accordingly, TrackNet did not breach the Simulcast Agreement when it stopped authorizing the transmission of its simulcast signal to Rosecroft once MRC withdrew its consent on April 29, 2009. Although the MRC's withdrawal of consent was invalidated by the Circuit Court for Prince George's County on May 1, 2009, by that time the MJC had also withdrawn its consent to Rosecroft. Thus, TrackNet did not breach the Simulcast Agreement by continuing to refuse to authorize the transmission of its signal to Rosecroft since Rosecroft did not have the necessary consents under the Act to continue to receive or accept wagering on out-of-state Thoroughbred horse racing simulcasts. If TrackNet or Churchill Downs had restored the simulcast signals to Rosecroft without the consent of the MJC, they would have violated the Interstate Horseracing Act.

## II. Cloverleaf's Arguments are Unsuccessful

Cloverleaf contends Defendants are not entitled to summary judgment for three reasons: 1) The Maryland Jockey Club did not have the legal right under the Act to withdraw its consent, 2) the Simulcast Agreement automatically terminates only when approval is withdrawn by a "government entity," and 3) Defendants willfully participated in an illegal group boycott of Rosecroft. None of these arguments is convincing.

### A. The Legality of the Maryland Jockey Club's Withdrawal of Consent is Irrelevant

Cloverleaf argues that MJC did not have a legal right to withdraw its consent because the Interstate Horseracing Act does not grant tracks within sixty miles a private right of action to enforce the Act's consent provision. Opp'n at 10-11. As a result, Cloverleaf contends that since MJC's withdrawal of consent was invalid, TrackNet's and Churchill Downs' subsequent decision to stop sending Rosecroft the simulcast signal breached the Simulcast Agreement. It was not, however, TrackNet and Churchill Downs' obligation to assess the validity or legality of MJC's withdrawal of consent. The Simulcast Agreement states only that it automatically terminates "upon the failure to obtain or withdrawal of any approvals required by applicable laws." Summ. J. Mem. Ex. 4, ¶ 16(A). Thus, once MJC withdrew its consent, TrackNet and Churchill Downs were no longer obligated to send the simulcast signal.

### B. The Simulcast Agreement Terminated after MJC's Withdrawal

Cloverleaf contends that the Simulcast Agreement automatically terminates only when a government entity withdraws its legally required authorization. Opp'n at 13. The basis for this argument is that the drafter of the Simulcast Agreement used different words -- "approvals," "consents," and "requirements" -- to convey different types of authorizations required. Cloverleaf argues that "approval" is used only in reference to approvals by government entities,

"consents" refers to authorizations from private parties like MJC, and "requirements" is used to refer both public and private authorizations under the Act. Thus, since the automatic termination provision uses the word "approval," Cloverleaf asserts that it is only triggered when a government agency withdraws its consent.

Cloverleaf's argument is contradicted by the language in the Simulcast Agreement which specifically indicates that the agreement can be terminated upon the failure to receive or the withdrawal of "*any* approvals required by any applicable laws." Summ. J. Mem. Ex. 3 at 12 (emphasis added). Furthermore, the Amendment to the Simulcast Agreement also states that it may be terminated "by Host if Host receives any information and exercises reasonable judgment that Guest's or any Secondary Recipient's exercise of any right granted herein may violate any applicable law." *Id*. Ex. 4 at 16. Even ignoring this language, the Act is one of the "applicable laws" that the Simulcast Agreement refers to, thus Rosecroft was required to comply with it in order to continue to receive the simulcast signal from TrackNet and Churchill Downs. When Rosecroft no longer received the appropriate approvals under the Act, the Simulcast Agreement automatically terminated, at which point TrackNet and Churchill Downs had no further obligation to authorize the simulcast transmission to Rosecroft.

### C. Rosecroft's Argument that Defendants Illegally Boycotted Rosecroft is Meritless

Cloverleaf claims that TrackNet and Churchill Downs, along with MJC and the Horsemen, conspired to orchestrate an illegal boycott to deprive Rosecroft of receiving the Thoroughbred simulcast signals in violation of antitrust laws, which bars Defendants from claiming the simulcast agreement automatically terminated upon MJC's withdrawal of consent. As an initial matter, Cloverleaf asserts no antitrust claims against TrackNet and Churchill Downs in its Amended Complaint. Moreover, Cloverleaf's support for this contention is merely proof

that emails were sent informing TrackNet and Churchill Downs of the MRC's and MJC withdrawals of consent. These notices do not prove Defendants took part in any anticompetitive scheme.

## CONCLUSION

For the reasons stated above, Defendants TrackNet and Churchill Downs' Motion for Summary Judgment (Paper No. 125) is GRANTED.

A separate Order follows.

Dated: August 25, 2010 /s/_____
Richard D. Bennett
United States District Judge